**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **SAMUELL KEELER AND** | § | |
| **LUKE GOSSETT,** | § | |
| **Plaintiffs,** | § | |
| | § | **NO. 4:22-CV-00905-SDJ** |
| **V.** | § | |
| | § | |
| **TYSON FRESH MEATS, INC.** | § | |
| **Defendant.** | § | |

---

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT AND BRIEF IN SUPPORT**

---

**COMES NOW** Plaintiffs Samuell Keeler and Luke Gossett and files this their Response to Defendant's Motion for Summary Judgment and Brief in Support, and would show the following:

**I.**
**BACKGROUND**

Plaintiff Samuell Keeler ("Mr. Keeler") began working for Defendant Tyson Fresh Meats, Inc. ("Defendant or Tyson") in 2005. (Exhibit 1 at 25)  Mr. Keeler began his career with Tyson as a frontline supervisor on night shift.  (Exhibit 1 at 25)  Over the next 144 years, he worked his way up to a Training Specialists at Tyson's plant in Sherman, Texas.  (Exhibit 1 at 25)  After dedicating 16 years of his lift to Tyson, Mr. Keeler was fired because of his religious beliefs.

Plaintiff Luke Gossett ("Mr. Gossett") began working for Defendant Tyson on August 28, 2006.  Mr. Gossett started with Tyson as a maintenance technician and over the next 15 years worked his way up to become a Maintenance Supervisor at Tyson's plant in Sherman, Texas.

(Exhibit 2 AT 22)  After dedicating 15 years of his lift to Tyson, Mr. Gossett was fired because of his religious beliefs.

On August 3, 2021, Tyson's President and C.E.O. Donnie King announced the company's decision to mandate the COVID-19 shot for all Tyson employees in the United States. [Dkt. 30-1 ¶ 8]  Tyson employees were required to take the COVID-19 shot by November 1, 2021 as a condition of continued employment.  [Dkt. 30-1]  Prior to November 1, 2021, "to ensure its employees stayed safe and healthy throughout the pandemic…[,Tyson] required unvaccinated employees to wear masks and face shields while at work."  [Dkt. 30-1]

On August 14, 2021, Mr. Keeler submitted a request for an exemption from Tyson's COVID-19 shot mandate due to his sincerely held religious beliefs. [Dkt. 30-1 ¶ 13 and 30-5] On that same day, Defendant, through its Human Resources manager John Kyker, recognized Mr. Keeler's request an offered what he described as an "accommodation." [Dkt. 30-1 ¶ 18]  The accommodation Defendant offered Mr. Keeler was termed Leave of Absence Plus ("LOA Plus"). [Dkt. 30-1 ¶ 12]  Under the LOA Plus program, Defendant equated Mr. Keeler's request for a religious exemption with a "disability" and refused to allow him to work or pay him for up to one year.  [Dkt  30-1 ¶ 18]

In its Motion for Summary Judgment, Tyson describes its LOA Plus accommodation as "an unpaid leave of absence-potentially for up to one year."[1] [Dkt. 30 at p. 3 ¶ 3] More clearly, if your religious exemption was granted, you were not allowed to work and you were not paid. [Dkt. 30-1]  If the employee refused to take the COVID-19 shot within a year,  he would be officially terminated.  [Dkt. 30 at p. 3 ¶ 3] The LOA Plus accommodation effectively terminated

---

[1] In its Motion for Summary Judgment, Tyson states, "Under the LOA Plus program, a team member who qualified for a disability or religious exemption could elect to take an unpaid leave of absence-potentially for up to one year, depending on the team member's length of service with Tyson.  [Dkt. 30 at p. 3-4]

Mr. Keeler's employment with Defendant.   Defendant would mistakenly have this Court consider its LOA Plus policy a "reasonable accommodation" upon which it believes summary judgment is appropriate. Anyone but Defendant would recognize the LOA Plus accommodation as a termination of employment.

On August 18, 2021, Mr. Gosset submitted his request for an exemption from Tyson's COVID-19 shot mandate due to his sincerely held religious beliefs. [Dkt. 30-1 ¶ 15 and 30-6] On that same day, Defendant, through its Human Resources manager, John Kyker, recognized Mr. Gossett's request and like Mr. Keeler offered him the LOA Plus "accommodation." [Dkt. 30-1 ¶ 18]  Because Mr. Gossett refused to take the COVID-19 shot due to his sincerely held religious beliefs, he too was offered LOA Plus, an accommodation where he would not be allowed to work and would not be paid.  [Dkt. 30-1 ¶ 12 and 18] Like Mr. Keeler, the accommodation was effectively a termination of Mr. Gossett's employment with Defendant.

On November 1, 2021, Mr. Keeler and Mr. Gossett were fired by Tyson for their refusal to take the COVID-19 shot in violation of their sincerely held religious beliefs. [Dkt. 30-1 ¶ 19]

## II.
## STANDARD OF REVIEW

Summary judgment is warranted only if, viewing all evidence in the light most favorable to the non-moving party, the record demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Moss v. BMC Software, Inc.,* 610 F.3d 917, 922 (5th Cir. 2010)(citing Fed.R.Civ.P. 56). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

**III.**

3

## ARGUMENT AND AUTHORITIES

Title VII prohibits an employer from discriminating against an employee on the basis of his religion, unless the employer is unable to reasonably accommodate the employee's religious exercise without undue hardship to its business. 42 U.S.C. §§ 2000e–2(a)(1), 2000e(j). To establish a prima facie case of religious discrimination under Title VII, the plaintiff must present evidence that (1) he held a bona fide/sincere religious belief, (2) his belief conflicted with a requirement of his employment, (3) his employer was informed of his belief, and (4) he suffered an adverse employment action for failing to comply with the conflicting employment requirement. *Bruff v. N. Miss. Health Servs., Inc.,* 244 F.3d 495, 499 n. 9 (5th Cir.2001).  Once Plaintiffs establish a prima facia case, the burden of proof shifts to the Defendant to prove it provided a reasonable accommodations or there was undue hardship which prevented it from providing a reasonable accommodation.  *Davis v. Fort Bend Cty*., 765 F.3d 480, 485 (5th Cir. 2014) (citing *Tagore v. United States*, 735 F.3d 324, 329 (5th Cir. 2013)).  Here, Defendant fired Mr. Keeler and Mr. Gossett for failing to take the COVID-19 shot in violation of their sincerely held religious beliefs.

### A.  <u>Mr. Keeler's and Mr. Gossett's  Religious Beliefs Are Bona Fide/Sincere</u>

Bona fide religious beliefs include "moral or ethical belief[s] as to what is right and wrong which are sincerely held with the strength of traditional religious views." *See, e.g*., 29 C.F.R. § 1605.1 (citing *United States v. Seeger*, 380 U.S. 163, 85 S. Ct. 850, 13 L. Ed. 2d 733 (1965)). A court's inquiry is limited to focusing upon the individual's motivation. Specifically, a court's task is to decide "whether [the individual's beliefs] are, *in his own scheme of things*, religious." *Seeger*, 380 U.S. at 185 (emphasis added). In this regard, a belief is "religious" if it is "[a] sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by .

4

. . God." *Seeger*, 380 U.S. at 176. Conversely, whether the belief itself is central to the religion, i.e., whether the belief is a true religious tenet, is "not open to question." *Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 790 (5th Cir. 2012) (quoting *Seeger*, 380 U.S. at 185) (internal quotation marks omitted) (discussing the threshold inquiry into a person's religious belief under the Religious Land Use and Institutionalized Persons Act); *see Tagore v. United States*, 735 F.3d 324, 328-29 (5th Cir. 2013) (applying *Moussazadeh* to a Title VII religious discrimination claim).The sincerity of a person's religious belief **is a question of fact** unique to each case. *Tagore*, 735 F.3d at 328; *Moussazadeh*, 703 F.3d at 791 ("This is doubly true regarding sincerity."). "The specific religious practice must be examined rather than the general scope of applicable religious tenets, and the plaintiff's 'sincerity' in espousing that practice is largely a matter of individual credibility." *Tagore*, 735 F.3d at 328; *see also Moussazadeh*, 703 F.3d at 791 ("[T]he important inquiry was what the prisoner claimed was important to him." (alteration in original) (citation and internal quotation marks omitted)).

1.  **Mr. Keeler's Request for a Religious Exemption**

On August 14, 2021, Mr. Keeler submitted the Reasonable Religious Accommodation Request Form provided by Defendant. [Dkt.30-5]  Mr. Keeler provided the following response to the question related to his beliefs:

> Q: Please specify the religious belief/practice you have for which you are      requesting accommodation.
>
> Keeler Response: **As a Christian, I take all major decisions to God first. Proverbs 1:5. I have been led by the Spirit not to take the Covid vaccine but to rely on God for my protection. Isaiah 54.17.**

[Dkt. 30-5]  Mr. Keeler let Tyson know his request for a religious exemption was guided by Proverbs 1:5: "A wise man will hear and will increase learning, and a man of understanding shall attain unto wise counsel."  Mr. Keeler provided additional scripture in support of his religious

exemption, referencing Isaiah 54:17: "No weapon that is formed against thee shall prosper; and every tongue that shall rise against thee in judgment thou shalt condemn.  This is the heritage of the servants of the Lord, and their righteousness is of me, saith the Lord."

In response to the next question present by Defendant in its Reasonable Religious Accommodation Request Form, Mr. Keeler writes: "I am asking to be exempted from the mandatory vaccine policy due to my personal religious beliefs.  Led by the Holy Spirit, Pro-life beliefs."  [Dkt. 30-5]

On August 14, 2021, Mr. Keeler also provided a letter to Tyson's Human ResourceS Department in support of his request for a Religious Exemption.  In the letter, he detailed his religious beliefs as they relate to the COVID-19 shot, stating:

> As a Christian, I take decisions in my life before God in prayer.  Proverbs 1:5, James 1:5.[2] I believe that God is my heeler and my protector, Isaiah 53:5.[3] 1 Peter 2:24,[4] Psalms 41:2.[5]  My family and I have fervently prayed abut this vaccine and have felt led by the Holy Spirit to not take it."

[Dkt. 30-5]  Mr. Keeler further expressed his basis for seeking a religious exemption, stating:

> Additionally, the mRNA Vaccines (Pfizer and Moderna) use fetal cell lines descended from cells taken from elective abortions in the 1970s and 1980s.  The Johnson and Johnson uses fetal cell cultures, specifically PER.CG (a retinal cell line that was isolated from a terminated fetus in 1985)  Sources:  (www.nebraskamed.com/COVID/) (https://www.icsi.org/covid-19-vaccine-faq)  As a Christian, I believe that life is precious and the shedding or use of innocent blood is a sin.  Jeremiah 1:5,[6] Leviticus 18:21.[7]"

---

[2] James 1:5 states, " If any of you lack wisdom, let him ask of God, who giveth to all men liberally and upbraideth not, and it shall be given him."

[3] Isaiah 53:5 states, "But he was pierced for our transgressions, he was crushed for our iniquities; the punishment that brought us peace was on him, and by his wounds we are healed."

[4] 1 Peter 2:24 states, ""He himself bore our sins" in his body on the cross, so that we might die to sins and live for righteousness; "by his wounds you have been healed."

[5] Psalms 41:2 states, "The LORD protects and preserves them—they are counted among the blessed in the land—he does not give them over to the desire of their foes."

[6] Jeremiah 1:5 states, ""Before I formed you in the womb I knew[a] you, before you were born I set you apart; I appointed you as a prophet to the nations."

[Dkt. 30-5]

### 2. **Mr. Gossett's Request for a Religious Exemption**

On August 18, 2021, Mr. Gossett submitted the Reasonable Religious Accommodation Request Form provided by Defendant. [Dkt.30-6]  Mr. Gossett provided the following response to the question related to his beliefs:

> Q: Please specify the religious belief/practice you have for which you are        requesting accommodation.
>
> <u>Gossett Response</u>: **I am a Christian and believe in Jesus Christ.  I have attached a religious exemption letter that explains my sincere request.**

[Dkt. 30-6] In his Religious Exemption Letter, Mr. Gossett identifies his sincerely held religious beliefs as they relate to the COVID-19 shot, stating:

> "I'm writing to request a religious exemption from [Tyson Food's] mandatory Covid shot directive. (In Philippians 4:6). The word of God tells us be anxious for nothing, but in everything by prayer and supplication with thanksgiving let your requests be made known to God. I have prayed and sought council from my Lord Jesus Christ on the Covid vaccine directive, and in light of my pro-life and other religious beliefs. The Holy Spirit has impressed upon my heart that his will for me is not to take the Covid vaccine. The Holy Spirit reminds me of Psalms 91[8]and what his word says. Verse 10, No evil will befall you, Nor will any plague come near your tent. 1 Corinthians 6:19-20[9], I believe that innocent life is sacred to God, from conception, to birth and to natural death.

---

[7] Leviticus 18:21 states, "Do not give any of your children to be sacrificed to Molek, for you must not profane the name of your God. I am the LORD."

[8] Among other things, Psalm 91, states: 9) If you make the LORD your refuge, if you make the Most High your shelter, (10) no evil will conquer you; no plague will come near your home. (11) For he will order his angels to protect you wherever you go. (12) They will hold you up with their hands so you won't even hurt your foot on a stone. (13) You will trample upon lions and cobras; you will crush fierce lions and serpents under your feet! (14) The LORD says, "I will rescue those who love me. I will protect those who trust in my name.  (15) When they call on me, I will answer; I will be with them in trouble.
I will rescue and honor them.  (16) I will reward them with a long life and give them my salvation."

[9] I Corinthians 6: 19-20: **[19]** Do you not know that your bodies are temples of the Holy Spirit, who is in you, whom you have received from God? You are not your own; **[20]** you were bought at a price. Therefore honor God with your bodies."

(Jeremiah1:5)[10] I believe God's promise that "if anyone lacks wisdom, let him ask of God, who gives to all liberally." To go against Gods will for my life in this situation (Covid vaccine) would be a sin in my life. I cannot knowingly and purposely comment a sin against my God. Sin reaps death. Following God's will in my life reaps eternal life. My faith in God and obeying his directive is the most important thing I can do in my life. I understand that the manufacturers of the Covid shots have used aborted fetal cell lines as part of their development or testing of vaccines. My faith prohibits me from participating in or benefiting from an abortion, no matter how remote in time that abortion occurred.

 The Johnson & Johnson (Janssen Pharmaceuticals) COVID shot "did require the use of fetal cell cultures, specifically PER.C6, in order to produce and manufacture the vaccine." 1 Multiple state department of health "FAQs" confirm that while mRNA vaccines by Pfizer-BioNTech and Moderna do not "contain" fetal cells, but clearly state that "[e]arly in development of mRNA vaccine technology, fetal cells were used for 'proof of concept' (to demonstrate how a cell could take up mRNA and produce the SARS-CoV-2 spike protein) or to characterize the SARS-CoV-2 spike protein." 2 Thus, both Pfizer and Moderna used abortion-derived cell lines to "to test the efficacy of both vaccines." 3 Therefore, claims that Pfizer and Moderna "do not require the use of any fetal cell cultures in order to manufacture (produce) the vaccine" are in conflict with the statement that "such a cell line was used to test the efficacy of both vaccines." 4 "Testing the efficacy" is certainly a part of the research and development process.

As a believer in Jesus Christ, the Holy Spirit, God and his word the bible. It is against my faith and conscience to commit sin. The bible tells me that anything that violates the will of God is sin. I read and pray every day in my life and give him thanks in all things. I have been a Christian for many years and accepted Jesus Christ as my Lord and Savior. The Holy Spirit guides my heard in all thins. The Holy Spirit has moved and impressed upon my heart through daily prayer that I must not accept the Covid vaccine. I cannot go against the Holy Spirit and jeopardize my relationship with God and violating my conscience.

I'm therefore asking for an exemption from the mandatory Covid shot directive so that my conscience can remain clear before God. Thank you for your consideration."

[Dkt. 30-6]

### 3.  Mr. Keeler's and Mr. Gossett's Religious Beliefs are Sincere and There is a Conflict Between Tyson's COVID-19 Policy and Their Religious Beliefs

In its Motion for Summary Judgment, Tyson questions the sincerity of Mr. Keeler's and

Mr. Gossett's religious beliefs, arguing, among other things, that they fail to provide any factual

---

[10] Jeremiah 1:5 states: "Before I formed you in the womb I knew[a] you, before you were born I set you apart; I appointed you as a prophet to the nations."

or evidentiary support that their "beliefs that the COVID-19 vaccines were developed with fetal cell lines and cultures…is part of their religious beliefs." [Dkt. 29 at 9] Tyson further argues that because "Plaintiffs previously received the Influenza vaccine and took medications-such as Tylenol/Acetaminophen, ibuprofen, and Aspirin-which are tested and/or developed using fetal cell lines." their religious beliefs are insincere. [Dkt. 30 at p. 6-7] Defendant provides no evidence that Mr. Keeler and Mr. Gossett were aware of what testing goes into Tylenol/Acetaminophen, ibuprofen, and Aspirin. Additionally, Defendant ignores most of the basis for Plaintiffs' beliefs, including the fact that they "took the decision to God", sought guidance from the Holy Spirit, relied on God for their protection, and see God as their heeler and protector. Further, in its Motion for Summary Judgment, Tyson ignores the biblical mandates provided in the scriptures cited by Plaintiffs in their requests for religious exemption.

The Fifth Circuit has cautioned that judicial inquiry into the sincerity of a person's religious belief "must be handled with a light touch, or judicial shyness." *Tagore*, 735 F.3d at 328 (citation and internal quotation marks omitted). "[E]xamin[ing] religious convictions any more deeply would stray into the realm of religious inquiry, an area into which we are forbidden to tread." *Id*. (alteration in original) (citation and internal quotation marks omitted). "[T]he sincerity of a plaintiff's engagement in a particular religious practice is rarely challenged," and "claims of sincere religious belief in a particular practice have been accepted on little more than the plaintiff's credible assertions." *Id*. Tyson seeks to try Mr. Keeler and Mr. Gosset for heresy, arguing that they do not hold the sincerely held religious beliefs identified in their request for a religious exemption related to the COVID-19 shot.

Accordingly, drawing all reasonable inferences in favor of Mr. Gossett and Mr. Keeler as the nonmoving parties, and considering the "light touch" and "judicial shyness" that must be

exercised, Plaintiffs' testimony and the explanation provided in their requests for a religious exemption, sufficiently evidence a genuine dispute of material fact whether they hold a bona fide religious belief as it relates to taking the COVID-19 shot. *See Tagore*, 735 F.3d at 328 ("[C]laims of sincere religious belief in a particular practice have been accepted on little more than the plaintiff's credible assertions.").  Here, there is ample evidence to create a genuine issue of material fact as to the sincerity of Mr. Keeler's and Mr. Gossett's religious beliefs as they relate to their refusal to take the COVID-19 shot.

### B.  Plaintiffs' Request for an Accommodation and the Alleged Hardship is a Fact Question for the Jury

In *Groff v. DeJoy*, the United States Supreme Court made a significant change to the standard for religious accommodations for employees under Title VII of the Civil Rights Act of 1964. 432 U.S. 63 (2023).

Although the *Groff* Court goes to great lengths to explain that they are not "overruling" prior precedent, and they are simply "clarifying" the rule announced in *Hardison v. Trans World Airlines, Inc.*, 527 F. 2d 33, 42–44 (1975), the Court effectively overruled the employer-friendly "de minimis" standard that has been applied since 1975 in religious accommodation cases.

Since *Hardison*, the rule has been that religious accommodations are not required when they result in more than a de minimis cost to the employer (a standard articulated by the United States Supreme Court in *Hardison*).  Now, religious accommodations will not be required when they require "substantial" costs to the employer.  This is an undeniably different standard than articulated by the Court in *Hardison*.

### 1.  Undue Hardship Standard Applies to Reasonable Accommodation

In *Hardison,* the Supreme Court said that an employee's request for religious accommodations would constitute an "undue hardship" when it results in more than a "de

minimis" cost to the employer. This is the standard the courts used since <u>1975</u>.  In *Hardison*, the Supreme Court also said that an employee's request for religious accommodations would constitute an "undue hardship" when it results in "substantial" costs to the employer. "Substantial" means just about the opposite of "de minimis," and the courts have more or less ignored the "substantial" costs language of *Hardison* (resulting in outcomes favorable to employers).

The *Groff* Court clarified that the standard is actually "substantial" costs, not "more than de minimis costs."  432 U.S. 63.  This new standard should result in outcomes more favorable to employees seeking the religious exemptions. "Undue hardship" means a "substantial burden" "in the overall context of an employer's business."  *Id*.  What is most important is that "undue hardship" in Title VII means what it says, and courts should resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test.  Under any definition, a "hardship" is significantly more than "de minimis," and the modifier "undue" means that the standard is something even greater than just hardship – the hardship must be "excessive" or "unjustifiable," Random House 1547, Webster's Third 2492 ("inappropriate," "unsuited," or "exceeding or violating propriety or fitness"), American Heritage 1398 ("excessive").

### 2.  Mr. Keeler's and Mr. Gossett's Interaction with Co-Workers Was Limited

Mr. Keeler's job did not require significant interaction with his co-workers.  In fact, much of his work could be done remotely.  For example, one of Mr. Keeler's responsibilities was to check the knife room.  Mr. Keeler, a training specialist, identifies several opportunities for checking the knife room without being physically on-site. In fact, Tyson had equipment installed to enable Mr. Keeler to monitor the knife room remotely. Tyson could have explored a remote arrangement

with Keeler without suffering any undue hardship.  During his deposition, Mr. Keeler testified that he could check the knife room remotely:

> Q: Checking the knife room…don't you agree that that's something that probably needs to be done in person?
> A: It could be. It wasn't a requirement. There was [sic] videos in the room. I could check in on the room. I could have the conversation. There was a telephone present. So, essentially – In – in certain circumstances, that job could have been – could have been done remotely, I believe.

(Exhibit 1 at 30)

Mr. Keeler further testified to the following:

> Q: Do you believe that position, this training specialist, could have been done a hundred percent remote?
> A: Yes.

(Exhibit 1 at 30)

Mr. Gossett, a maintenance supervisor, testified that Tyson had approved another maintenance supervisor – same grade, who worked at the Sherman plant –to work remotely for three to four months, Clint Simmons. Mr. Simmons submitted a request for a medical and not a religious exemption.  Mr. Gossett testified to the following:

> Q: [D]o you think that some type of arrangement [with Mr. Simmons] could have been made to accommodate your religious exemption request?
> A: Absolutely.

> Q. Well – and – and [sic] what would that be? How would you describe that?
> A: …[I]f Tyson didn't want to follow what had worked for the past 18 months and – you know, testing and wearing a mask, they could have done the same thing that Clint Simmons done. I could have worked a majority a lot of things from home. We each had laptops, company issued. I could have had phone conversations with my techs. I could have –Clint Simmons or BJ Thomas were both more than capable to fill that gap.

(Exhibit 2 at p. 126]

Like Mr. Keeler, Mr. Gossett also could have worked remotely without causing Tyson any undue hardship. Clint Simmons whose medical exemption was granted, worked from home and like Mr. Gossett, was a maintenance supervisor. When Clint Simmons worked from home, Mr. Gossett handled the few tasks that required one to be on site. For instance, Mr. Gossett helped out with a meeting with a vendor. Mr. Gossett was also filling out Clint Simmons' "hot work permits," which only a supervisor could do. Mr. Gossett testified to the following:

> Q: [Y]ou had conversations with him [Mr. Simmons] to cover
> vendors for him while on-site…did I hear that right?
> A: Yes.

(Exhibit 2 at p. 124)  Even though working hot permits, for example, was typically done on site, the available maintenance supervisors on-site, could execute the task.  Mr. Gossett testified, "But I had to fill out all kinds of hot work permits. So, his [,Mr. Simmons,] guys couldn't do welding on the floor. They couldn't do nothing without a supervisor to fill out and look for all that." (Exhibit 2 at p. 125)

### 3. Mask, Social Distancing, Disinfecting Surfaces, Face Shield, and Temperature Checks Constitute a Reasonable Accommodation

In its Motion for Summary Judgment, Tyson admits that it utilized social distancing, disinfecting surfaces, and enforcing a mask policy," to "stay ahead of the curve."  [Dkt. 30 at p. 14 and ] These mitigation measures were implemented protect the health and safety of Tyson employees. "Tyson[further] admits that it had a program that required unvaccinated employees to wear masks and face shields while at work."  [Dkt. 30-1 ¶ 7] "Tyson further admits that the masks and face shield policy was designed to ensure its employees stayed safe and healthy throughout the pandemic."  [Dkt. 30-1 ¶ 7] Tyson's policy later changed to requiring the COVID-19 shot as a condition for employment. [Dkt. 30-1 ¶ 8].

13

In their Reasonable Religious Accommodation Request Form, Tyson asks: "What are some accommodation options?"  [Dkt. 30-5]  Mr. Keeler responded, stating: "Wearing required PPE, (Face Shield and Mask) while in the facility."  [Dkt. 30-5]  In response to the same question, Mr. Gossett wrote, "Reasonable accommodations is what has been working for last 18 month.  Face shield, Temperature scans, social distancing, self COVID measures and ext."  [Dkt. 30-6] Here, Tyson failed to provide a "reasonable accommodation" for Mr. Keeler's and Mr. Gossett's sincerely held religious beliefs.  Tyson failed to grant Plaintiffs' request to wear mask, be tested, temperature checks, face shields, and socially distancing themselves from others.  [Dkt. 30-5 and 30-6]  The only accommodation Tyson  was willing to implement was its LOA Plus policy. Tyson's LOA Plus accommodation is illusory and anything but a reasonable accommodation. Tyson's LOA Plus policy/accommodation left Mr. Keeler and Mr. Gossett without a job and a paycheck.  This is not an accommodation in any sense of the word; it is a termination of employment.

### 4.  <u>Tyson's LOA Plus is Not A Reasonable Accommodation</u>

The only so called "accommodation" offered to Mr. Keeler and Mr. Gossett was the LOA Plus program.  Again, LOA Plus requires the employee to be fired.  Specifically, the employee is not allowed to work for Tyson and does not get paid by Tyson; this is anything but an accommodation.  LOA Plus is Tyson telling Mr. Keeler and Mr. Gossett, "You're fired!"

### 5.  <u>Whether Tyson Provided a Reasonable Accommodation is a Fact Question</u>

Ordinarily, questions of reasonableness are best left to the fact finder.  *EEOC v. Universal Mfg. Corp.*, 914 F.2d 71, 73 (5th Cir. 1990). Clearly, a fact question exists as to whether Tyson's LOA Plus Policy is a "reasonable accommodation" in this case.  Additionally, a fact question

exists as to whether other accommodations were reasonable, i.e., masks, social distancing, periodic testing, and temperature checks. Due to the fact questions presented in the case regarding the whether Tyson provided Plaintiffs with a reasonable accommodation, summary judgment should be denied.

### 6. Tyson Claims it Offered Plaintiffs Their Jobs Back a Year Later

In its Motion for Summary Judgment, Tyson claims it offered Plaintiffs their jobs back on October 27, 2022, almost a year after they were fired. [Dkt. 30-1 ¶19-20] The offers were for less pay, different positions, and odd hours.

### C. Tyson's Vaccine Mandate Violates Public Policy

### 1. Courts Create Exceptions to At-Will Employment to Uphold State Law

Texas law embraces the public policy exception Plaintiffs rely on and prohibits the termination policy enacted by Tyson. Executive Order GA-40, which has the "force and effect of law," prohibits Defendant from compelling Mr. Keeler and Mr. Gossett to take any COVID-19 shot. *See* TEX. GOVT. CODE § 418.012; Executive Order GA-40, issued October 11, 2021.

The at-will employment doctrine is a judicially-created doctrine subject to exceptions. *Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733, 735 (Tex. 1985). Texas state courts have not addressed a situation like this one. But the situation is in the spirit of *Sabine Pilot* where the courts did make an exception to vindicate the state's public policy interest in having its laws upheld. *See id.* The same interest applies here. The state has a public policy interest in having its law upheld.

By allowing Executive Order GA-40 to stand for years, the Legislature has set a limit. Employers may not terminate employees for failure to take a COVID-19 vaccination for any reason of personal conscience, based on a religious belief, or for medical reasons. *See* Executive Order GA-40, issued October 11, 2021.  Recently, the Texas Legislature passed  a sweeping ban on COVID-19 vaccine mandates for employees of private Texas businesses, prohibiting private businesses like Tyson from making the COVID-19 shot a condition for employment.  TX SB7, 2023,  88th Legislature 3rd Special Session.  SB 7 has further memorialized the public policy of the State of Texas;   private employers cannot make the COVID-19 shot a condition for employment.

Because a public policy exception to at-will employment vindicates the state's public policy interest in its law, state courts likely would create a public policy exception to at-will employment in this case. *See Sabine Pilot Serv., Inc.*, 687 S.W.2d at 735.

**2.   Texas Law Prohibits Defendant's Vaccination Policy**

Executive Order GA-40 prohibited Defendant's policy and properly suspended any conflicting statute. Defendant's COVID-19 policy required employees to take an Emergency Use Authorized ("EUA") vaccines as a condition for employment.

**i.    Executive Order GA-40 prohibited Defendant's Vaccine Policy.**

Executive Order GA-40 provides, "COVID-19 vaccines are strongly encouraged for those eligible to receive one, but must always be voluntary for Texans." GA-40.  GA-40 states:

> No entity in Texas can compel receipt of a COVID-19 vaccine by any individual, including an employee or a consumer, who objects to such vaccination for any reason of personal conscience, based on a religious belief, or for medical reasons, including prior recovery from COVID-19. I hereby suspend all relevant statutes to the extent necessary to enforce this prohibition.

*See* Executive Order GA-40, issued October 11, 2021 (prohibiting vaccine mandates).

Governor Abbott issued GA-40 pursuant to a disaster proclamation. *See id.* GA-40 supersedes "any other relevant statutes, to the extent necessary to ensure that local officials do not impose restrictions in response to the COVID-19 disaster that are inconsistent with this executive order." *Id.* While ordinarily, an executive order may not conflict with a statute, the Legislature authorized the governor to suspend statutes when addressing a state of disaster. TEX. GOVT. CODE § 418.016. The Legislature tasked the governor with responsibility for meeting "dangers to the state and people presented by disasters." *Id.* § 418.011.

In section 418.012, the Legislature enacted a statute stating, "the governor may issue executive orders, proclamations, and regulations and amend or rescind them. Executive orders, proclamations, and regulations have the force and effect of law." *Id.* § 418.012. Texas Government Code section 418.016 explicitly allows the governor to "suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business or the orders or rules of a state agency if strict compliance with the provisions, orders, or rules would in any way prevent, hinder, or delay necessary action in coping with a disaster. *Id.* § 418.016.

Because Governor Abbott issued Executive Order GA-40 pursuant to a disaster proclamation, the Executive Order has the force and effect of law and properly suspends section 224.002 of the Texas Health and Safety Code. *See* Executive Order GA-40, issued October 11, 2021. Accordingly, not only is Defendant not required to mandate vaccination against COVID-19, Defendant was barred from doing so under Texas law.

### ii.     Executive Order GA-40 is Texas law.

Texas public policy prohibits terminating employees for refusing to take a COVID-19 vaccine. Executive Order GA-40 prohibits employers from compelling employees to take a vaccine for "any reason of personal conscience, based on a religious belief, or for medical

reasons, including prior recovery from COVID-19." *See* Executive Order GA-40, issued October 11, 2021.   Defendant's policy violates this broad prohibition.   While the policy contains an exemption process for individuals with medical conditions or sincerely held religious beliefs, these exemptions are insufficient to comply with GA-40. For example, Defendants policy does not meet the requirements of Executive Order GA-40 because it does not allow an exemption for prior recovery from COVID-19 or another medical reason that is not a medical condition..   Additionally, objecting to a vaccine for "any reason of personal conscience" is broader than Defendant's exemption for sincerely held religious beliefs. *Compare id.* Even if Defendants have a sufficient exemption process for the exemptions listed in their mandate, Defendant's  mandate conflicts with the requirements of Executive Order GA-40.

Section 418.014(c) gives the Legislature the power to "terminate a state of disaster at any time." Tex. Govt. Code § 418.014(c).   Thus, the Legislature did not approve of Executive Order GA-40, the Legislature could have terminated the state of disaster and the legal effect of Executive Order GA-40. *See id.* But the Legislature did not.   By failing to act to terminate the effect of Executive Order GA-40 or pass a bill that changed the scope of Executive Order GA-40, Executive Order GA-40 is the law in Texas.   Because Executive Order GA-40 "the force and effect of law," the Legislature has essentially blessed Executive Order GA-40 as Texas law. *See* Tex. Govt. Code § 418.012.

### 3.   GA-40 is Not Preempted by Federal Law

Plaintiffs' claims do not arise out of the FMIA. "Federal preemption is a question of law reserved for the court." *Zamalloa v. Thompson Landscape Services, Inc.*, 4:17-CV-00519-ALM-KPJ, 2018 WL 3032677, at *3 (E.D. Tex May 3, 2018) report and recommendation adopted,

4:17-CV-00519-ALM-KPJ, 2018 WL 2928083 (E.D. Tex. June 12, 2018). Preemption can be express or implied. *METX, LLC v. Wal-Mart Stores Tex., LLC*, 62 F. Supp. 3d 569, 575 (E.D. Tex. 2014). "State law is expressly preempted when Congress uses clear preemptive language in the federal statute or regulation." *Id*. "Absent express preemptive language, a federal statute or regulation impliedly preempts state law when the language indicates a Congressional intent to exclusively and completely occupy a legislative filed." *Id*.

Tyson argues that the preemption clause in the FMIA expressly preempts Plaintiffs' state law claims. This argument is incorrect based on a plain reading of the FMIA.

For starters. Plaintiffs' claims do not arise under the FMIA, which "regulates a broad range of activities at slaughterhouses to ensure the safety of meat and the humane handling of animals." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 455 (2012); *see also Meaunrit v. The Pinnacle Food Groups, LLC*, C 09-4555 CW, 2010 WL 1838715, at *5 (N.D. Cal. May 5, 2010) (noting that "Congress enacted the FMIA and the PPIA in part to prevent the interstate transfer of adulterated and misbranded meat and poultry products.").

The FMIA expressly preempts states from regulating "the inspection, handling, and slaughter of livestock for human consumption." *Nat'l Meat Ass'n*, 565 U.S. at 455. It does not preempt state common law claims. *See id*. at 467, n. 10 (explaining that the FMIA does not preempt "state laws of general application [such as] workplace safety regulations, building codes, etc.").

Moreover, there is no private right of action under the FMIA. *See Rogers v. Tyson Foods, Inc.* 308 F.3d 785 (7ᵗʰ Cir. 2002). In *Rogers*, the court found that complete preemption "can only exist where, *inter alia*, the federal statute provides a private right of action." *Id*. at 790. In other words, even if Plaintiffs' claims fell under the FMIA preemption clause – which they clearly do

not – preemption would still be improper because the FMIA does not contain a private right of action for claims like those Plaintiffs bring here.

4.   **Tyson is Not Entitled to Judgement as a Matter of Law on Plaintiff's Disparate Treatment Claim**

Under Title VII, a disparate treatment claim is proven by showing a (1) an adverse employment action, and 2) this action was taken against the plaintiff because of her protected class. *See Raj v. La. State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013) (internal citations omitted).

**(i)      Adverse Employment Action**

There are sufficient facts for a jury to reasonably infer that Plaintiffs suffered an adverse employment action when Tyson offered twelve (12) months of unpaid leave as an accommodation to their religious exemption requests and subsequently terminating their employment on November 1, 2021. It is indisputable that the LOA Plus policy altered the terms and conditions of Plaintiffs' employment.

Therefore, there is sufficient basis to reasonably infer that Tyson's LOA Plus policy was an adverse employment action. Moreover, the termination of Plaintiffs on November 1, 2021 is indisputably an adverse employment action.

**(ii)      Action Taken Because of Plaintiffs' Protected Class**

There is sufficient evidence to reasonably infer that Tyson treated similarly situated employees outside of their protected class more favorably. Keeler and Gossett submitted religious exemption requests that established a *bona fide* religious belief. This supports a reasonable inference that Keeler and Gossett were members of a protected class under Title VII based on their sincerely held religious beliefs.

Both Mr. Keeler and Mr. Gossett were told that working remotely was not an option without any further discussion.   Mr. Kyker did not seek guidance from human resources.

However, as described above, Clint Simmons submitted a medical exemption request and was approved to work remotely. Luke Gossett, however, who held the same job title as Clint Simmons and worked at the same plant, submitted a religious exemption request, and was offered unpaid leave for twelve months as an accommodation. Sam Keeler could have worked off site in a portable building unit to mitigate viral transmission in the workplace, but Tyson gave him only one option – to take leave without pay. Here, there is a sufficient basis to conclude that Clint Simmons was treated more favorably than Keeler and Gossett in the accommodations process.  Clearly, people of faith were not offered the same accommodations as others.

Additionally, Tyson offered thousand of dollars as a reward to any vaccinated employee. (Exhibit 2 at 69) This marginalized and segregated the vaccinated from the unvaccinated. Tyson intended to reward the vaccinated employee and punish the unvaccinated.   Accordingly, a genuine issue of material fact exist as to whether Tyson is liable for disparate treatment.

## IV.
## CONCLUSION

Accordingly, for the reasons stated herein, Mr. Keeler and Mr. Gossett request the Court enter an order denying Defendant's Motion for Summary Judgment.  Mr. Keeler and Mr. Gossett further request any and all relief to which they are entitled.

Respectfully submitted,

**WOODFILL LAW FIRM, P.C.**

 */s/ Jared R. Woodfill*
Jared R. Woodfill
State Bar No. 00788715
3 Riverway, Suite 750
Houston, Texas 77056
Tel: (713) 7851-3080
Fax: (713) 751.3058
Email: woodfillservice@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 22, 2023, the foregoing document was electronically filed in the above and foregoing with the Clerk of the Court, utilizing the ECF system, which sent notification to all parties and counsel.

_/s/ Jared R. Woodfill_
Jared R. Woodfill
Attorney for Plaintiffs